IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

CATHERINE P.,                          )
                                       )
                 Plaintiff,            )
                                       )
         v.                            )      1:23CV950
                                       )
LELAND DUDEK,                          )
Acting Commissioner of Social Security,)
                                       )
                 Defendant.            )

## MEMORANDUM OPINION AND ORDER
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Catherine P. ("Plaintiff") brought this action pursuant to Section 205(g) of the Social Security Act (the "Act"), as amended (42 U.S.C. § 405(g)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for Disability Insurance Benefits ("DIB") under Title II of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I.      PROCEDURAL HISTORY

Plaintiff protectively filed her application for DIB on December 7, 2020, alleging a disability onset date of June 12, 2020. (Tr. at 10, 190-94.)[1] Her application was denied initially (Tr. at 103-11, 121-25) and upon reconsideration (Tr. at 112-20, 132-36). Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 137-38.) On July 27, 2022, Plaintiff, along with her attorney, attended the subsequent

---

[1] Transcript citations refer to the Sealed Administrative Record [Doc. #5].

telephone hearing, at which Plaintiff and an impartial vocational expert testified. (Tr. at 10, 40-102.) Following the hearing, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act (Tr. at 23), and, on September 1, 2023, the Appeals Council denied Plaintiff's request for review, thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review (Tr. at 1-6).

II.     LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2]

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period

---

[2] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[3] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that

---

[3] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

4

a significant number of jobs exist which the claimant could perform, despite the claimant's impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III. DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since her alleged onset date. Plaintiff therefore met her burden at step one of the sequential evaluation process. (Tr. at 13.) At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments:

> systematic lupus erythematosus (SLE), trigger finger, tendonitis, osteoarthritis, and obesity[.]

(Tr. at 13.) The ALJ found at step three that none of these impairments, individually or in combination, met or equaled a disability listing. (Tr. at 15-16.) Therefore, the ALJ assessed Plaintiff's RFC and determined that she could perform light work with further limitations, described as follows:

> [Plaintiff] is limited to lifting, carrying, pushing, and/or pulling twenty pounds occasionally, and ten pounds frequently. She can sit for six hours in an eight-hour workday and can stand and/or walk for six hours in an eight-hour workday. Further, she is limited to frequent handling and fingering with the bilateral upper extremities.

(Tr. at 16.) At step four of the analysis, the ALJ determined that Plaintiff's past relevant work did not exceed her RFC. Specifically, the ALJ found that Plaintiff remained capable of

performing her past relevant work as a teacher for the emotionally impaired. (Tr. at 23.) Therefore, the ALJ concluded that Plaintiff was not disabled under the Act. (Tr. at 23.)

Plaintiff now contends that the ALJ "erred by failing to consider Plaintiff's depression, anxiety, and posttraumatic stress disorder ("PTSD") to be severe impairments and include resulting limitations in the [RFC assessment]." (Pl.'s Br. [Doc. #12] at 1.) As an initial matter, Plaintiff acknowledges that the ALJ's omission of a severe impairment at step two does not, without more, necessitate remand. "As long as the ALJ determines that the claimant has at least one severe impairment and proceeds to discuss all of the medical evidence, any error regarding failure to list a specific impairment as severe at step two is harmless." McClain v. Colvin, No. 1:12CV1374, 2014 WL 2167832, at *4 (M.D.N.C. May 23, 2014) (citations omitted).[4] However, in the present case, Plaintiff contends that the ALJ's subsequent analysis also failed to account for the effects of her mental impairments on her ability to work.

At step two, the ALJ included depression, anxiety, and PTSD when listing Plaintiff's non-severe impairments. In doing so, the ALJ noted that "[t]reatment and other records show these conditions are generally well-controlled and have not caused more than minimal or brief

---

[4] Step two is a threshold determination of whether claimants have a severe impairment (or combination of impairments) that meets the twelve-month duration requirement and significantly limits their ability to do basic work activities. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii) (2010). If the Commissioner finds no severe impairments, the claimant is not disabled and the analysis does not proceed to the other steps. Id. However, if a claimant does have a severe impairment or combination of impairments, the ALJ must consider the effects of both the severe and non-severe impairments at the subsequent steps of the process, including in the determination of RFC. See 20 C.F.R. § 404.1523 (2010); Social Security Ruling 96–8p, Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, 1996 WL 374184, at * 5 (July 2, 1996). If the ALJ proceeds to discuss and consider the non-severe impairment at subsequent steps, there is no prejudice to the claimant. See Thomas v. Commissioner, Soc. Sec. Admin., No. SAG–11–3587, 2013 WL 210626, at *2 (D. Md. Jan. 17, 2013) (finding harmless error where ALJ continued with sequential evaluation process and considered both severe and non-severe impairments); Kenney v. Astrue, No. CBD–10–1506, 2011 WL 5025014, at *5 (D. Md. Oct. 20, 2011) (declining to remand for failure to classify an impairment as severe because it would not change the result).

limitation in [Plaintiff's] ability to perform work-related activities." (Tr. at 13.) While this explanation applied to all of Plaintiff's non-severe impairments, both mental and physical, the ALJ went on to provide an additional, lengthy explanation regarding her treatment of the mental health evidence in this case:

> In terms of [Plaintiff's] mental impairments, the record shows [Plaintiff] only sought limited and conservative, routine mental health treatment (Exhibit 5F, 11F, 16F, 17F, 19F), and the record reflects multiple situational stressors, including her finances, her son's legal issues, and the pandemic (Exhibits 12F/19, 16F/21, 19F/1-2, 7), with improvement noted once her finances stabilized (Exhibit 16F/21, 20F/25). [Plaintiff's] allegations as to the limiting effects of her mental impairments are not consistent with treatment sought, treatment provided when treatment was sought, findings on examination when treatment was sought, and her ongoing, albeit part-time, work activity. When she presented for an initial evaluation with a mental health provider at The Neil Group in April 2021 for evaluation of depression and anxiety and to have a disability form signed, she was advised the provider would not sign the form, because [Plaintiff] had said she felt her physical problems were leading to her disability (Exhibits 11F/2, 17F/1). Despite some reported symptoms, mental status examination was benign other than for an anxious mood or affect (Exhibits 11F/3, 17F/2). She returned to The Neil Group for an assessment in October 2021, and some distractibility, preoccupied thought content, anxious and depressed mood and only fair judgment, insight, concentration, and reasoning were noted at that time (Exhibit 19F/1- 4). On her only two subsequent appointments with The Neil Group, in November 2021 and then not again until April 2022, mental status examination findings were almost entirely benign (Exhibit 19F). Notably, at the April 2022 visit, she reported doing well on her medication but having some anxiety due to lack of income (Exhibit 19F/7).

(Tr. at 14.)

After providing this summary, the ALJ specifically considered the four broad areas of mental functioning, also known as the "paragraph B" criteria, set out in the regulations. (Tr. at 14-15); see also 20 C.F.R., Part 404, Subpart P, Appendix 1, 12.00E. These areas of mental functioning are (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, and maintaining pace; and (4) adapting and managing

7

oneself. (See Tr. at 14-15.) For each of these areas, the ALJ must rate Plaintiff's degree of limitation as none, mild, moderate, marked, or extreme. 20 C.F.R., Part 404, Subpart P, Appendix 1, 12.00F(2).

In the present case, the ALJ found that Plaintiff had no limitations in her ability to understand, remember, or apply information, and mild limitations in the other three paragraph B areas. (Tr. at 14-15.) Plaintiff nevertheless contends that her mental impairment are severe "because of the degree of poor concentration and stress intolerance she experiences." (Pl.'s Br. at 8.) Accordingly, she challenges, in part, the ALJ's mild findings regarding Plaintiff's ability to maintain concentration, persistence, and pace and her ability to adapt and manage herself.

In terms of concentration, persistence, and pace, the ALJ specifically noted that

> [t]he record fails to show any mention of distractibility and an inability to complete testing that assesses concentration and attention. Although some distractibility, preoccupied thought content, anxious and depressed mood[,] and only fair judgment, insight, concentration, and reasoning were noted on an assessment in October 2021, mental status examinations otherwise mostly noted no significant abnormality in this area. [Plaintiff] reported [that] her symptoms were at times exacerbated by emotional or situational stress, but her medication generally controlled her symptoms well.

(Tr. at 15) (internal citations omitted). Similarly, with respect to understanding, remembering, or applying information, the ALJ noted that Plaintiff:

> was able to provide information about her health, describe her prior work history, and respond to questions from medical providers. The providers noted she was alert and oriented. She answered questions clearly. She had good concentration and memory (Exhibit 11F). Mental status examinations generally noted no significant abnormality in cognition or memory (Exhibits 18E, 6, 16, 22, 5F/5, 11F/2-3, 12F/18, 16F/19, 17F/2, 19F/2, 8, 20F/4, 10, 14, 24, 21F/30). [Plaintiff] reported her symptoms were at times exacerbated by emotional or situational stress, but her medication generally controlled her symptoms well (Exhibits 12F, 16F, 21F/25).

8

(Tr. at 14.) In terms of Plaintiff's ability to adapt or manage herself, the ALJ explained that "the record showed [that Plaintiff] lives alone, has appropriate grooming and hygiene, no significant problem getting along well with providers and staff, and no problems with temper control. Treatment records reflect that [Plaintiff] was cooperative, well groomed, well nourished, and well developed." (Tr. at 15) (internal citations omitted).

The ALJ specifically noted that she had "considered all of [Plaintiff's] medically determinable impairments, including those that are not severe, when assessing [Plaintiff's] residual functional capacity." (Tr. at 15.) With respect to Plaintiff's mental impairments, the ALJ concluded that those impairments caused, at most, mild functional problems, as discussed above, which thus did not cause limitations in Plaintiff's RFC. Moreover, in explaining the basis for her RFC assessment, the ALJ went on to discuss numerous reasons for discounting Plaintiff's assertions regarding the severity of her mental impairments.

Notably, the ALJ acknowledged Plaintiff's allegations "that loud noises and voices affected her, that she was a "nervous wreck," that she had IBS and pancreatitis due to stress, and that she was sometimes so tired she spent the day in bed. Plaintiff further reported having problems with memory and concentration due to "lupus fog." (Tr. at 17.) However, she testified that the "biggest issues that prevented her from working were fatigue and pain." (Tr. at 17.) Ultimately, the ALJ found that Plaintiff's "statements concerning the intensity, persistence[,] and limiting effects of [her] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." (Tr. at 17.) In making this finding, the ALJ noted that, in the months leading up to her alleged onset date, Plaintiff regularly reported "hating her job as a teacher," and that her job dissatisfaction, along with financial stress and

9

her oldest child's legal troubles, were the source of her anxiety and depression. (Tr. at 17-18.) In May 2020, Plaintiff reported to her mental health care provider, Justina Okonkwo, that "her anxiety and depression had increased 'more than anything due to her working as a teacher at home.'" (Tr. at 18) (quoting Tr. at 655).

On June 1, 2020, Plaintiff returned to her treating rheumatologist, noting that she was trying to apply for disability. After a benign mental and physical examination, Dr. Gay advised Plaintiff that she did not have signs of active lupus and that lupus was unlikely to qualify her for disability. (Tr. at 18.) Plaintiff "was noted to have responded that she had 'enough other medical problems to warrant applying for it[,] and specifically mentioned PTSD, depression, and anxiety.'" (Tr. at 18) (quoting Tr. at 429). However, "[o]n returning to Ms. Okonkwo three days later regarding her mental health, [Plaintiff] reported [that] her medications were working and she was having no side effects, and she declined a referral for cognitive behavioral therapy." (Tr. at 18, 651.)

As further recounted by the ALJ,

> In August 2020, [Plaintiff] reported to Ms. Okonkwo that her primary care physician and rheumatologist had refused to complete FMLA and STDI forms. She said that she cannot return to work with all of her medical conditions including lupus and that she is unable to master the virtual system of education. At that time, [Plaintiff] was provided a work note for two weeks.

(Tr. at 18) (citing Tr. at 648) (internal citations omitted). In that medical record, Ms. Okonkwo noted that Plaintiff "reports doing well as an Avon rep and has sold over $11,000 worth of Avon products this month; also excited about [her] son's progress academically." (Tr. at 648.) Later that month, as noted by the ALJ, Plaintiff established care with a new primary care physician, again expressing her desire to pursue disability. (Tr. at 18, 640-42.)

10

In December 2020, Plaintiff "presented to Lauren Tessneer for [her] mental health concerns and expressed an interest in seeing a therapist, although her mood and affect were normal at that time, and [Plaintiff] did not want to change her medications." (Tr. at 19, 610-12.) Nurse Practitioner Tessneer's record for that visit reflects that Plaintiff was alert and oriented with a normal mood and affect, and on review of systems, anxiety and depression were "present" but other symptoms were "<u>not</u> present" including impaired cognitive function, inability to concentrate, and memory loss. (Tr. at 612) (emphasis added). The record also reflects that Plaintiff's "associated symptoms do not include . . . social difficulties, employment difficulties, financial difficulties, [or] difficulty with activities of daily living." (Tr. at 610.) As noted by the ALJ, Plaintiff's mental status exams were benign. (Tr. at 19.) For example, in March 2021, Nurse Practitioner Tessneer performed mental status examinations reflecting that Plaintiff was

> able to articulate well with normal speech/language, rate, volume and coherence, thought content normal with ability to perform basic computations and apply abstract reasoning, associations are intact, no evidence of hallucinations, delusions, obsession or homicidal/suicidal ideation, demonstrates appropriate judgment and insight, displays ability to recall recent and remote events and fund of knowledge is intact and attention span and ability to concentrate are normal.

(Tr. at 807, 801.) Plaintiff saw Nurse Practitioner Tessneer again several times during the spring and summer of 2021, and those visits all reflect similar assessments, and also note that Plaintiff's anxiety and depression were "improved with medication." (Tr. at 800, 805-07, 799-801, 787-89, 885-87, 881-83, 877-79.)

11

The ALJ considered these records and noted that Plaintiff's mental health care going forward continued to reflect circumstantial stressors, good management with medication, and a focus on obtaining disability.[5]

> In April 2021, [Plaintiff] presented to the Neil Group for an initial evaluation of depression and anxiety and asked for a disability form to be completed. [Plaintiff] reported that her other providers would not fill out the disability forms. However, she was advised they could not fill out disability forms, as [Plaintiff] felt her physical problems were leading to her disability. She was advised that she needed to work with a lawyer and primary care physician. During 2021, [Plaintiff] continued [treatment] at Bethany Medical for medication management for her mental health and other concerns and generally reported that her medication[s] were working well but that her circumstances at times made things challenging. Both physical and mental status examination remained mostly benign, other than for obesity, and her provider there, Terri Wood-Cummings, MD, reported in November 2021 that she was "[s]till completing monthly disability forms on patient's behalf."
>
> [Plaintiff] returned to the Neil Group in April 2022 after not having been seen in about a year and reported [that] Bethany Medical would not refill her medication due to not having been in for a visit in a while, and she reported doing well on her medications but having a lot of anxiety due to lack of income.

(Tr. at 19) (internal citations omitted).[6] Notably, by June 2022, Plaintiff reported that "she was doing better now that her finances had stabilized." (Tr. at 19, 941).

Overall, the ALJ found that Plaintiff's alleged "mental health limitations are not consistent with her treatment history, with her reported response to medication, with findings

---

[5] At around this same time, in March 2021, Plaintiff underwent a Physical Functional Capacity Evaluation, but "the evaluator felt she had not put forth a full effort" and "the evaluator noted the test results were 'heavily influenced' by 'significant self-limiting behavior.'" (Tr. at 19, 327.)

[6] These records from the Neil Group reflect that at her first visit in April 2021, the PA noted that Plaintiff "wants us to sign a disability form. . . I told her I could not sign her form because she feels her physical problems are leading to her disability and she would need to work with her lawyer and [Primary Care Physician]." (Tr. at 900.) Plaintiff was assessed as "alert and oriented" with "good concentration and memory." (Tr. at 900-01.) The next visit in October 2021 noted "mild impairment" with issues related to financial struggles and stress related to her son's legal issues. (Tr. at 907-08.) However, a subsequent visit in April 2022 reflects appropriate mood and affect, clear speech, intact thought process, intact memory, good insight, good concentration, and average or above intellectual functioning. (Tr. at 914.)

on mental status evaluations, and with her ongoing work as an Avon representative." (Tr. at 20.) The ALJ further explained that Plaintiff's "alleged limitations are noted to have been influenced significantly by situational stressors with reported improvement on alleviating those stresses, such as improvement in her financial situation." (Tr. at 20.) Along these lines, the ALJ noted that

> [Plaintiff] had clearly experienced some dissatisfaction with the demands of her job prior to seeking disability, as she had reported to several providers that she hated her job and she later expressed having an inability to adjust to the virtual education system during the pandemic. She also recounted considerable and understandable stress due to her son's legal troubles and her financial situation. As detailed herein, she has given varying and inconsistent statements regarding the reasons she feels she cannot work. Although certainly some variation could reflect simply [sic] some changes in her condition, the overall record here does not reflect a strong medical basis for that variation.

(Tr. at 20.)

In further support of her findings, the ALJ relied on medical opinion evidence supplied by the State agency psychological consultants and the initial and reconsideration levels. At the initial level, Kendra McCarty, Psy.D., determined from her review of the evidence that Plaintiff had mild limitations in concentration, persistence, and pace, but no limitations in understanding, remembering, or applying information, no limitations in interacting with others, and no limitations in adapting or managing oneself. (Tr. at 21, 107.) At the reconsideration level, Sean Sayers, Ph.D., found Plaintiff mildly limited in three functional areas: interacting with others, concentrating, persisting, and maintaining pace, and adapting or managing herself. Like Dr. McCarty, Dr. Sayers found no limitations in Plaintiff's ability to interact with others. (Tr. at 21, 116.) Because these opinions support no more than mild

13

limitations in any mental functional area, they also support the ALJ's ultimate omission of mental limitations in Plaintiff's RFC assessment, as discussed above.

The only other opinion evidence relating to Plaintiff's mental functioning comes from Dr. Wood-Cummings, who, as previously mentioned, submitted multiple documents relating to Plaintiff's long-term disability claim in 2021. Although Dr. Wood-Cummings asserted in the forms that Plaintiff's major depressive disorder, anxiety, and chronic pain rendered Plaintiff unable to work, the ALJ correctly notes that only one of Dr. Wood-Cummings' opinions included any functional limitations. (Tr. at 22, 210-12, 217-18, 345-47.) In her December 12, 2021 opinion, Dr. Wood-Cummings

> stated that [Plaintiff] was unable to perform "most functions requiring sustained effort and concentration, all requiring repetitive physical effort," and she stated [that Plaintiff] had "demonstrated inability to concentrate/focus on even sedentary job tasks for months now due to significant anxiety and depression which are aggravated by variably recurrent symptoms of her chronic physical conditions."

(Tr. at 22) (quoting Tr. at 346-47) (internal brackets omitted). The ALJ found this opinion unpersuasive. In particular, she noted that the "extreme limitations" opined by Dr. Wood-Cummings were "not consistent with [Plaintiff's] treatment records or activities," as previously discussed in the administrative decision. (Tr. at 22.) The ALJ also noted that, in Dr. Woods-Cummings' most recent treatment notes prior to that form, from November 2021, Plaintiff exhibited normal mood and affect as well as "essentially benign" physical findings. (Tr. at 22, 864-66.)[7]

---

[7] The medical records reflect that in May 2021, Dr. Wood-Cummings noted that Plaintiff had started going to the Neil Group for counseling and medication management, and Dr. Wood-Cummings explained to Plaintiff that "she can only see 1 mental health provider for patient safety and symptom management." (Tr. at 784.) Dr. Wood-Cummings' records for Plaintiff's next visits in August 2021 and November 2021 note normal mental status exam and no psychiatric treatment. (Tr. at 863-66, 870-73.). Subsequent records from Dr. Wood-

In sum, substantial evidence clearly supports the ALJ's determination that Plaintiff's mental impairments were non-severe and required no functional limitations. Notably, this is not an instance in which the ALJ found one or more impairments non-severe at step two and then failed to consider or discuss their impact later in the analysis. The ALJ in this case discussed Plaintiff's allegations of disabling depression, anxiety, and PTSD throughout her analysis, including Plaintiff's testimony, treatment notes, activities, and opinion evidence relating to these impairments, as set out at length above. In addition, the Court notes that contrary to Plaintiff's contentions, this is not a case where the ALJ discounted an examiner's findings because they were based solely on subjective complaints, or otherwise relied on the lack of objective medical evidence.[8] Instead, the ALJ's decision reflects that the ALJ relied on

---

Cummings in June 2022 likewise reflect normal mental status examinations and that Plaintiff is "Followed by The Neil Group" for her depression. (Tr. at 918-22, 938-41.)

[8] When evaluating a claimant's symptoms, the ALJ's decision must "contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." Social Security Ruling ("SSR") 16-3p, Titles II and XVI: Evaluation of Symptoms in Disability Claims, SSR 16-3p, 2017 WL 5180304, at *10 (Oct. 25, 2017) ("SSR 16-3p"); see also 20 C.F.R. §§ 404.1529, 416.929. In Arakas v. Comm'r of Soc. Sec., 983 F.3d 83 (4th Cir. 2020), the Fourth Circuit clarified the procedure an ALJ must follow when assessing a claimant's statements:

> When evaluating a claimant's symptoms, ALJs must use the two-step framework set forth in 20 C.F.R. § 404.1529 and SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). First, the ALJ must determine whether objective medical evidence presents a "medically determinable impairment" that could reasonably be expected to produce the claimant's alleged symptoms. 20 C.F.R. § 404.1529(b); SSR 16-3p, 2016 WL 1119029, at *3.
>
> Second, after finding a medically determinable impairment, the ALJ must assess the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work and whether the claimant is disabled. See 20 C.F.R. § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *4. At this step, objective evidence is *not* required to find the claimant disabled. SSR 16-3p, 2016 WL 1119029, at *4–5. SSR 16-3p recognizes that "[s]ymptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques." Id. at *4. Thus, the ALJ must consider the entire case record and may "not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate" them. Id. at *5.

the assessments by Plaintiff's medical providers of the impact of her impairments on her mental status and functioning, as well as Plaintiff's reports regarding the effectiveness of medication and the improvement once her finances stabilized, the lack of impact on her activities including her work as an Avon representative, the specific assessment of the impacts in each of the Paragraph B areas of functioning, the limited and conservative nature of her mental health treatment with her focus on obtaining disability, her inconsistent statements to her providers regarding the basis for her disability claim, and the opinions of the state agency psychological consultants.  See Clifford E. v. O'Malley, No. 1:23CV704, 2024 WL 3105669, at *9-10 (M.D.N.C. June 24, 2024); Mary W. v. O'Malley, No. 1:23CV128, 2024 WL 1256268 at *11-12 (M.D.N.C. March 25, 2024); Lasharne W. v. Commissioner, Soc. Sec. Admin., No. SAG-21-2603, 2023 WL 2414497, at *4 (D. Md. Mar. 8, 2023); Anthony P. v. O'Malley, No. 1:22CV291, 2024 WL 965608, at *3 (E.D. Va. Mar. 6, 2024) ("[T]he ALJ in this case did not dismiss [the plaintiff's] subjective complaints based entirely upon the belief that they were not corroborated by the medical evidence; nor did the ALJ require that [the plaintiff's] subjective statements be validated by objective medical support. Rather, in assessing [the plaintiff's] subjective complaints, the ALJ considered [the plaintiff's] ability to complete . . . myriad . . .

---

983 F.3d at 95.  In Arakas, 983 F.3d at 97, the Fourth Circuit further explained that some conditions, such as fibromyalgia, simply do not manifest themselves in objective signs and symptoms.  983 F.3d at 97.  Several years later, in Shelley C. v. Comm'r of Soc. Sec. Admin., 61 F.4th 341, 361-62 (4th Cir. 2023), the court extended the reasoning in Arakas to include psychological impairments, and depression in particular.  Because the symptoms of both fibromyalgia and depression were "'entirely subjective,'" the ALJs in these cases erred by "requiring that [the claimants'] subjective statements be validated by objective medical support." Shelley C., 61 F4th at 361-62 (quoting Arakas, 983 F.3d at 96).  Plaintiff argues that the ALJ in the present case improperly relied on objective evidence to discount Plaintiff's subjective statements.  However, in this case, the ALJ did not require that Plaintiff's subjective statements be validated by objective tests or reports.  Instead, the ALJ's decision reflects that the ALJ considered all of the testimony and the record as a whole, and concluded that "statements concerning the intensity, persistence, and limiting effects of [Plaintiff's] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record."

16

daily activities, [his] own statements about his condition, and [his] treating provider's observations of [the plaintiff's] functioning. Fourth Circuit precedent does not suggest that ALJs should ignore objective evidence such as this; instead, Shelley C. and Arakas prevent ALJs from requiring claimants to provide medical evidence that would be impossible to produce given their specific medical conditions. The ALJ weighed the [plaintiff's] subjective complaints appropriately under those holdings and did not impose undue demands."). Contrary to Plaintiff's contentions, the ALJ in the present case did not require that Plaintiff's complaints of debilitating mental symptoms be validated by objective medical evidence. Rather, in accordance with 20 C.F.R. §§ 404.1529 and 416.929, SSR 16-3p, and relevant case law, the ALJ considered the medical evidence, including the assessments by Plaintiff's treating providers upon examination, as one of many factors when evaluating her subjective complaints. Further, given the extensive analysis set out in the decision, this is not a scenario in which the ALJ failed "to assess [the] claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015). Here, the ALJ reviewed the evidence, explained her decision, and clearly explained the reasons for her determination. That determination is supported by substantial evidence in the record. Plaintiff has not identified any errors that require remand.

IT IS THEREFORE ORDERED that the Commissioner's decision finding of no disability is AFFIRMED, that Plaintiff's Dispositive Brief [Doc. #12] is DENIED, that Defendant's Dispositive Brief [Doc. #13] is GRANTED, and that this action is DISMISSED with prejudice.

This, the 26th day of March, 2025.

/s/ Joi Elizabeth Peake
Joi Elizabeth Peake
United States Magistrate Judge